UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

James C.,

    Plaintiff,

    v.                                  Civil Action No. 2:19–cv–38

Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 11, 12)

Plaintiff James C. brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the

Commissioner of Social Security denying his applications for Disability Insurance

Benefits (DIB) and Supplemental Security Income (SSI).  Pending before the Court

are Plaintiff's motion to reverse the Commissioner's decision (Doc. 11), and the

Commissioner's motion to affirm the same (Doc. 12).  For the reasons stated below,

Plaintiff's motion is GRANTED, in part; the Commissioner's motion is DENIED;

and the matter is REMANDED for further proceedings and a new decision.

## Background

Plaintiff was 37 years old on his alleged disability onset date of August 1,

2008.  As a child, he struggled in school, both academically and socially, but was

able to attain a high school diploma.  He has held many different jobs for short

periods, including as a machine operator, a carpenter helper, a janitor, and a gas

station attendant.  Plaintiff was married when he was in his 20s.  His wife suffered

several miscarriages and then delivered a child with severe birth defects who died days after her birth. (AR 181.) In around 2001, Plaintiff and his wife divorced. (AR 181, 1155.) He now lives by himself in a mobile home in Waterbury.

Plaintiff has suffered several severe traumas in his life, including being extensively burned in a house fire in April 2005 and significantly injured in an automobile accident in April 2008. These incidents have left him with permanent physical injuries, primarily to his hands and right leg, and also with mental impairments including posttraumatic stress disorder (PTSD), anxiety, and sleep problems including chronic nightmares. Additionally, Plaintiff has hemochromatosis (a disorder in which the body stores too much iron) and carpal tunnel syndrome.

In the 2005 fire, Plaintiff suffered burns to his head, neck, and hands, leaving him with sensitivity in those areas to the sun, cold, water, and exertion. Additionally, his hands often crack and bleed, especially when exposed to water, humidity, or cold weather; or when he picks up something heavy or squeezes too frequently or tightly. In the 2008 car accident, Plaintiff suffered an injury to his right femur (thigh bone). A rod was placed, but he still had chronic pain and difficulty walking or climbing stairs. In November 2015, the rod was removed, and Plaintiff's pain lessened.

As for his mental impairments, Plaintiff has poor focus and memory, and difficulty concentrating on short tasks. Moreover, Plaintiff testified that he has "awful," repetitive nightmares "all the time." (AR 196.) His nightmares are "of

people peeling my skin off, because I was awake during my operation [for burn treatment]." (*Id.*) Due to the nightmares and other issues, Plaintiff averages less than three hours of interrupted sleep each night. (AR 197.)

Since the 2005 fire, Plaintiff has largely isolated himself in his home, venturing out only to grocery shop and attend medical appointments. He feels he is unable to live with anyone due to his nightmares and irritability. He also has social anxieties and is not effective at communicating with others. Plaintiff testified: "I've been isolated for eight years. I don't see people. I won't go near people. I pace back and forth for 21 hours a day [in] a dark house." (AR 186.) He has only one friend who comes over to play cribbage and drink beer about once a week. (AR 170, 193, 203.) In October 2015, Plaintiff stated that he "spends his days doing nothing," other than: shoveling his driveway when necessary (and then he is in bed for a day or so after), watching movies, building fishing rods, cooking for himself, learning the computer "a bit," and driving to appointments (but not far due to pain). (AR 816.)

In August 2015, Plaintiff filed applications for DIB and SSI. In his disability application, he alleged that he has been unable to work since August 1, 2008 due to burns on his shoulders, neck, face, and hands; a rod in his right leg; a bone spur in his right hip; depression; and a "[l]earning disability with computers." (AR 485.) His applications were denied initially and upon reconsideration, and he timely requested an administrative hearing. On June 22, 2017, Administrative Law Judge (ALJ) Paul Martin conducted a hearing on Plaintiff's applications. (AR 154–219.) Plaintiff appeared and testified, and was represented by counsel. A vocational

expert (VE) also testified at the hearing.  On August 2, 2017, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from his alleged onset date through the date of the decision.  (AR 275–88.)

Thereafter, the Appeals Council granted Plaintiff's request for review of the ALJ's decision, and remanded the case for a new hearing and decision, finding that: (1) the ALJ's RFC determination was not specific enough regarding Plaintiff's ability to have "[l]imited interactions with the general public" (AR 281), and was internally inconsistent regarding Plaintiff's manipulative limitations in fingering and handling (AR 296); (2) the VE's testimony at the hearing was inconsistent with the Dictionary of Occupational Titles (DOT) regarding limitations in fingering and handling, and the ALJ's decision did not address this inconsistency (AR 297); and (3) the ALJ mischaracterized the VE's testimony regarding other jobs Plaintiff could perform (*id.*).

On November 8, 2018, ALJ Martin held the second hearing on Plaintiff's applications.  (AR 98–153.)  Plaintiff again appeared and testified, and was represented by counsel; and a VE also testified.  On January 3, 2019, the ALJ issued a second decision finding that Plaintiff was not disabled under the Social Security Act from his alleged disability onset date through the date of the decision. (AR 11–26.)  Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–7.) Having exhausted his administrative remedies, Plaintiff filed the Complaint in this action on March 14, 2019.  (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at

steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, in his January 2019 decision, ALJ Martin first determined that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of August 1, 2008. (AR 14.) At step two, the ALJ found that Plaintiff had the following severe impairments: "Depression, Anxiety, Attention Deficit Hyperactivity Disorder, Residual Effects from Burns, and a Femoral Shaft fracture."[1] (*Id.*) Conversely, the ALJ found that Plaintiff's carpal tunnel syndrome, right shoulder impairment, hemochromatosis, rib/neck pain, and chest pain/syncope/hypertension, were each nonsevere. (AR 14–15.) The ALJ also noted that, "although [Plaintiff] may have issues with alcohol abuse, the objective medical evidence of record does not support a finding that [Plaintiff] is disabled even when considering the effects of that substance abuse." (AR 15.) Acknowledging that multiple providers noted Plaintiff's continued moderate to heavy alcohol use, despite their recommendations that Plaintiff cease all alcohol use, the ALJ stated: "there is no evidence that [Plaintiff's] physical

---

[1] Later in the decision, the ALJ noted that Plaintiff's right leg had healed and thus, "this impairment became nonsevere by 2016." (AR 20.) Nonetheless, the ALJ stated that he "considered the related exertional limitation for the entire period." (*Id.*)

impairments worsened with his alcohol use, and even considering his ongoing alcohol use, his combined impairments do not direct a finding of disability." (AR 15–16.)

At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.* at 16.) Next, the ALJ determined that Plaintiff had the RFC to perform "light work," as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except as follows:

> [Plaintiff] can frequently finger and handle bilaterally. He must avoid extreme heat and extreme cold. He must avoid excessive exposure to water (meaning that he must avoid working with water involving his hands to avoid cracks in his skin). He must avoid prolonged or concentrated exposure to humidity. [He] can maintain concentration, persistence, and pace for one[-] to four[-]step tasks in two-hour blocks over a normal eight-hour workday. He can engage in routine interactions with coworkers and supervisors (meaning that he needs to work on his own, but he can be around coworkers and supervisors), but he cannot interact with the general public.

(AR 18.) Applying this RFC, the ALJ found that Plaintiff was unable to perform his past relevant work as a gas station attendant and a carpenter helper. (AR 24.) Nonetheless, the ALJ determined that there are other jobs existing in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of hand packager inspector, price marker, and mail sorter. (AR 25.) The ALJ concluded that Plaintiff had not been under a disability from his alleged disability onset date of August 1, 2008 through the date of the decision. (AR 26.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff claims the ALJ made three principal errors: (1) failing to find that Plaintiff's hemochromatosis was a severe impairment at step two of the sequential analysis; (2) failing to give enough weight to the opinions of Plaintiff's treating primary care physician and examining neuropsychologist, failing to weigh the opinions of an examining psychological consultant and an examining social worker, and giving too much weight to the opinions of the nonexamining agency consultants; and (3) adopting testimony of the VE that is inconsistent with the DOT and other documented vocational evidence. (*See* Doc. 11-2.) In addition, Plaintiff contends the Appeals Council erred in denying review of the ALJ's decision, despite the submission of new evidence—January 2019 treatment notes—that was submitted after the ALJ's decision. (*Id.* at 9.) In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence and complies with the applicable legal standards. (Doc. 12.)

As discussed below, the Court finds no ALJ error at step two, and no error in the Appeals Council's decision not to review the ALJ's decision based on new evidence. On the other hand, the Court finds error in the ALJ's analysis of the medical opinions, requiring remand for further proceedings and a new decision.

## I. ALJ's Step-Two Finding that Plaintiff's Hemochromatosis Was Nonsevere.

Plaintiff first claims the ALJ erred in finding that Plaintiff's hemochromatosis was nonsevere at step two of the sequential analysis. (*See* AR 14–15.) In his decision, the ALJ explained that, although Plaintiff had been diagnosed and treated for hemochromatosis after a metabolic panel revealed elevated iron levels, providers recorded in treatment notes that Plaintiff was "largely asymptomatic with no abnormalities on physical examinations." (AR 14.) The ALJ further stated that treating providers noted Plaintiff's liver profile improved with regular treatment (phlebotomies), even despite Plaintiff's continued alcohol use against the advice of his providers (*see, e.g.*, AR 986, 990). (AR 14–15.)

It is the claimant's burden to show at step two that he has a "severe" impairment or combination of impairments, meaning an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(c); *see* 20 C.F.R. § 404.1522, "for a continuous period of at least 12 months," 20 C.F.R. § 404.1509. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."). "[T]he standard for a finding of severity . . . is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)). An impairment is "not severe" when medical evidence establishes "only a slight abnormality . . . [,]

which would have no more than a minimal effect on [the claimant's] ability to work." SSR 85-28, 1985 WL 56856, at *3 (1985); *see* SSR 96-3P, 1996 WL 374181, at *1 (July 2, 1996).

Plaintiff has not shown that his hemochromatosis significantly limited his physical or mental ability to do basic work activities during the relevant period. As noted by the ALJ (AR 14), around the time of the diagnosis of hemochromatosis in July 2014, treatment notes indicate that Plaintiff was "asymptomatic." (AR 985–86.) The ALJ correctly stated: "[E]ven with breaks in treatment and continued alcohol use, there is no evidence that [Plaintiff's] hemochromatosis caused any physical symptoms." (AR 15 (citing AR 1283–84).) Plaintiff argues that "[t]he sheer number of appointments he attends to treat hemochromatosis, as well as the fatigue prior to each treatment," impose more than minimal restriction on his ability to engage in basic work activities. (*Id.* at 1.) But even assuming that Plaintiff required phlebotomy treatments weekly,[2] there is no indication that he could not receive those treatments during a work break or before or after work hours. Plaintiff argues that if he did not obtain the treatments, he could develop liver disease, heart problems, and diabetes. (*See id.* at n.1; *see also* Doc. 15 at 1.) But there is no dispute that Plaintiff should obtain the treatments: the issue is whether being required to obtain them significantly limited his ability to work during the alleged disability period. Plaintiff has not demonstrated that fact. The only

_____

[2] At the June 2017 administrative hearing, Plaintiff testified that he obtained the treatments every eight weeks. (AR 208.) In his Reply, Plaintiff stated that he received phlebotomy treatments weekly during the year 2015, and thereafter, every few months. (*See* Doc. 15 at 1 (citing AR 682, 684, 689–70, 700, 932–35, 986, 989–90, 1016–19, 1101, 1206, 1208–13, 1283, 1287, 1326).)

symptom Plaintiff has discussed in relation to his hemochromatosis is "fatigue prior to each treatment" (Doc. 15 at 1), but the phlebotomy treatments appear to adequately address the fatigue (*see, e.g.*, AR 208 (Plaintiff testimony in June 2017 that he feels tired before phlebotomy treatments every two months, but then "feel[s] better" after treatment), 989 (July 2015 treatment note documenting return appointment for weekly phlebotomy and noting Plaintiff tolerated treatment well), 990 (July 2016 treatment note documenting follow-up appointment for hemochromatosis and describing Plaintiff as "pleasant and in no distress" on examination)).

For these reasons, the Court finds no error in the ALJ's finding that Plaintiff's hemochromatosis was nonsevere at step two of the sequential analysis.

## II. ALJ's Analysis of the Medical Opinions in Assessing Plaintiff's Mental RFC

Next, Plaintiff contends the ALJ erred in giving "great weight" to the opinions of nonexamining agency consultants Thomas Reilly, PhD and Roy Shapiro, PhD; "some weight" to the opinions of examining consulting neuropsychologist Dr. Laura Flashman, PhD; and "little weight" to the opinions of treating primary care physician Joseph Brock, MD. (AR 23.) Plaintiff also claims the ALJ erred in failing to weigh the opinions of examining consultant Gregory Korgeski, PhD, and failing to mention the opinions of examining social worker Daniel Baslock, LICSW. The Commissioner contends that the ALJ's analysis of the medical opinions is legally proper and supported by substantial evidence, stating:

> [I]t is not enough for a plaintiff to merely disagree with the ALJ's weighing of the evidence or to argue that the evidence in the record could support his position. Instead, the plaintiff must show that no reasonable factfinder could have reached the ALJ's conclusions based on the evidence in the record.

(Doc. 12 at 14.) Although the Commissioner correctly states the legal standard, *see Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), the Court finds that the ALJ did not properly weigh the medical opinions, which prejudiced his RFC determination regarding Plaintiff's mental limitations, as discussed below.

Dr. Brock, Plaintiff's primary care physician, began treating Plaintiff in June 2016, assessing Plaintiff as having hemochromatosis, chronic right hip pain, PTSD, and moderate episode of recurrent major depressive disorder. (AR 930.) Later, Dr. Brock added diagnoses of insomnia and attention deficit hyperactivity disorder (ADHD). (*See* AR 1028, 1228.) On June 6, 2017, Dr. Brock completed a Medical Source Statement (Mental) wherein he opined that, due mainly to his ADHD and PTSD, Plaintiff had marked limitations in most areas of mental functioning, including understanding and remembering short instructions; carrying out short, simple instructions; making judgments on simple work-related decisions; interacting appropriately with the public, supervisors, and coworkers; and responding appropriately to usual work situations and to changes in a routine work setting. (AR 1051–53.) Given these limitations, Dr. Brock questioned Plaintiff's capacity to manage his financial affairs. (AR 1053.)

The regulations in effect at the time Plaintiff filed his claim provide that the opinions of treating physicians like Dr. Brock are generally entitled to deference

over opinions provided by non-treating medical and non-medical sources including consultative examiners like Drs. Reilly and Shapiro.  The so-called "treating physician rule" provides that a treating source's opinions on the nature and severity of a claimant's functional limitations are entitled to "controlling weight" if they are "well[] supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[3]  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2);[4] *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993); SSR 96-2p, 1996 WL 374188 (July 2, 1996) (rescinded effective March 27, 2017) (providing guidance regarding the treating physician rule).  The deference afforded to a treating source's opinions may be reduced, however, in consideration of other factors, including the length and nature of the treating source's relationship with the claimant, the extent to which the medical evidence supports the treating source's opinions, whether the treating source is a specialist, the consistency of the treating source's opinions with the rest of the medical record, and any other factors that tend to contradict the treating

---

[3] The "treating physician rule" has been eliminated, but remains applicable to claims like this that were filed before March 27, 2017. *See Cortese v. Comm'r of Soc. Sec.*, No. 16-cv-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017); *see also Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 82 Fed. Reg. 15263-01, 2017 WL 1105348 (Mar. 27, 2017) (noting that, due to changes in the regulations regarding evaluation of medical evidence for claims filed on or after March 27, 2017, SSRs 96-2p, 96-5p, and 06-3p are rescinded).

[4] Some of the regulations cited in this Opinion and Order, including 20 C.F.R. §§ 404.1527 and 416.927 and other regulations applicable to the review of medical source evidence, have been amended effective March 27, 2017.  But, as noted above with respect to the treating physician rule, those new regulations "apply only to claims filed on or after March 27, 2017." *Smith v. Comm'r*, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) (summary order).  Where, as here, a plaintiff's claim was filed prior to March 27, 2017, "the [c]ourt reviews the ALJ's decision under the earlier regulations." *Rodriguez v. Colvin*, CASE NO. 3:15CV1723(DFM), 2018 WL 4204436, at *4 n.6 (D. Conn. Sept. 4, 2018).

source's opinions. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). If the ALJ gives less than controlling weight to a treating source's opinions, he must provide "good reasons" in support of that decision. *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

Although the ALJ recognized that Dr. Brock "treated [Plaintiff] as a primary care physic[ian]," the ALJ gave Dr. Brock's opinions "little weight," primarily on the grounds that they are not consistent with Dr. Brock's own treatment notes and other objective evidence in the record, and they do not include "any significant objective findings related to [the PTSD diagnosis]." (AR 23.) The Court finds that Dr. Brock was not required to make "significant objective findings" to support the PTSD diagnosis, and that substantial evidence does not support the ALJ's finding that Dr. Brock's opinions are inconsistent with the other medical evidence. To the contrary, Dr. Brock's opinions are consistent with not only his own treatment notes but also with several other medical opinions contained in the record. For example, regarding Dr. Brock's own treatment notes, in April 2017, Dr. Brock recorded in a treatment note that Plaintiff "remains disabled with [PTSD] [and] social anxiety" (AR 1022), and assessed Plaintiff as having "[m]oderate episode of recurrent major depressive disorder," requiring "more supervision and structure" and a "closer relationship with Washington County [M]ental [H]ealth" (AR 1023). In February 2018, Dr. Brock assessed Plaintiff with PTSD, chronic nightmares related to his prior trauma, poor sleep, insomnia, and ADHD. (AR 1215.) Dr. Brock also noted

that Plaintiff had "severe generalized anxiety," and a trial of clonidine had not helped. (AR 1214.)

Dr. Brock's opinions are consistent with those of other treating providers, including Ann Burzynski, APRN (advanced practice registered nurse), who diagnosed Plaintiff with major depressive disorder and PTSD in an October 2015 treatment note, recognizing "[t]he significance of the intensity of past trauma for [Plaintiff] with the burn, the loss of his biological daughter[,] and the complex medical issues [he has experienced] since age 21." (AR 790.) Nurse Burzynski also noted Plaintiff's "horrible sleep pattern," including intense nightmares, and stated that these nightmares were "more magnifying than the depression and anxiety" to Plaintiff. (*Id.*) In March 2017, Nurse Burzynski and another treating provider, Hannah Carpenter, MA, signed a document titled "Individual Plan of Care," wherein they stated: "[Plaintiff's] presenting issues consist of ongoing struggles with complex trauma, racing thoughts, anxiety, isolative behaviors, difficulty in public settings, depression, re[]occurring nightmares, medical[-]related issues, and impairment in multi-faceted areas of . . . daily functioning." (AR 1090.) In an April 2017 treatment note, Carpenter stated that Plaintiff "has a significant history of trauma-related symptoms that are interconnected with medical history," and that Plaintiff "struggles with multi-faceted areas of life and in various life roles." (AR 1056.) Carpenter continued:

> [Plaintiff] has made numerous attempts while working with this clinician in the past to find adequate employment and maintain that employment with no success thus far. [He] has had difficulty in accepting and/or moving forward with assessing funding from assistance

programs. [He] has demonstrated significant struggles in following through with managing paperwork and/or following up with guidance. [He] has reported continued struggles with debilitating trauma-related symptoms, ongoing anxiety, isolative behaviors, avoidance of public settings, depression, continued pacing in his home for hours, and possib[ly] a lack of adequate sleep.

(*Id.*) In May 2017, Nurse Burzynski recorded in a treatment note that Plaintiff was "anxious with racing thoughts and has difficulty being around other people." (AR 1092.) And finally, in September 2017, Carpenter completed a general assistance form for the State of Vermont wherein she opined that Plaintiff was unable to work due to his PTSD, ADHD, and depression. (AR 1154.)

Dr. Brock's opinions are also consistent with those of social worker Daniel Baslock, LICSW (licensed independent clinical social worker), LADC (licensed alcohol and drug counselor). In a Mental Status Exam dated September 11, 2018, Baslock reported that Plaintiff was depressed and had pressured speech, anxious mood, wandering attention, and poor insight and judgment. (AR 1346–47.) Baslock diagnosed major depressive disorder (recurrent episode with anxious distress), PTSD, ADHD, and agoraphobia. (AR 1348.) Baslock assigned a Global Assessment of Functioning (GAF)[5] score of 33 to Plaintiff, which indicates "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed

_____

[5] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, at 32 (4th ed. 2000). Of note, in 2013, the American Psychiatric Association published the DSM-V, which "drop[s]" reference to the GAF. *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-V)*, at 16 (5th ed. 2013).

man avoids friends, neglects family, and is unable to work . . . )." *DSM-IV* at 32. Baslock recommended case management services, continued therapy, vocational supports, assessment of alcohol problems, and possible participation in social groups. (AR 1348.) Although the opinions of Baslock are consistent with the opinions of Dr. Brock, the ALJ did not consider them in his decision.

Because Nurse Burzynski, Carpenter, and social worker Baslock are not physicians or psychologists, they are not considered "acceptable medical sources" under the regulations, and thus their opinions are not entitled to the same weight as those of a treating physician like Dr. Brock. 20 C.F.R. §§ 404.1513(a), 416.913(a). Nonetheless, the ALJ was required to at least consider them in the context of assessing the weight of Dr. Brock's opinions. *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (ALJ improperly disregarded social worker's opinion simply because it was the opinion of a social worker, not on account of its content or whether it conformed with the other evidence in the record). Social Security Ruling 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources" to show the severity of the claimant's impairments and how they affect the claimant's ability to function. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). These "other sources" include medical sources who are not "acceptable medical sources," such as nurse practitioners and licensed clinical social workers, and "non-medical sources" such as social welfare agency personnel. *Id.* SSR 06-03p explains that medical sources like nurse practitioners and licensed clinical social workers, who are not

technically deemed "acceptable medical sources" under the regulations, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. Thus, opinions from these medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*

The ALJ also explained his decision to give little weight to Dr. Brock's opinions by stating that "there is no evidence of poor working memory as noted in Dr. Brock's opinion." (AR 24.) This is inaccurate. In fact, after performing a Neuropsychological Evaluation of Plaintiff on December 14, 2017, consulting neuropsychologist Dr. Flashman found that Plaintiff's immediate recall for contextual verbal information was in the mildly impaired range; delayed recall was in the borderline range; recognition memory was in the impaired range; recall of a previously copied complex figure was in the impaired range; and recognition of figure elements was in the impaired range. (AR 1159.) Dr. Flashman explained: "[I]t appears that [Plaintiff's] memory complaints, which manifested as difficulties with encoding new information, particularly when the material was less structured, are likely representative of poor attention; that is, because he has problems properly attending to information, he never learns it, and therefore, cannot later recall it." (AR 1160.) Based on the test results, Dr. Flashman also opined that Plaintiff's overall intellectual functioning was in the "borderline range" (AR 1159), and that Plaintiff had "significant mood symptoms, including anxiety, PTSD, and

depression." (AR 1161.) Dr. Flashman recommended psychological treatment, behavioral therapy, medications to treat his nightmares and ADHD, compensatory strategies to improve attention, avoidance of external distractions and multi-tasking, completing only one task at a time, writing down complicated information, and taking frequent short breaks between tasks. (*Id.*)

Despite acknowledging that Dr. Flashman is an "acceptable medical source" and that her opinions "are largely consistent with and supported by the medical evidence of record," the ALJ gave only "some weight" to Dr. Flashman's opinions, finding that her evaluation "did not break down [Plaintiff's] abilities in vocationally relevant terms" and thus was "of limited use in determining [Plaintiff's] overall [RFC]." (AR 23.) This was not a good reason for giving only "some weight" to the opinions of Dr. Flashman, especially considering that they were consistent with the opinions of Dr. Brock. Although, as the ALJ explained, Dr. Flashman's report did not contain formal opinions regarding Plaintiff's functional abilities and limitations, this is not a requirement under the regulations. The ALJ noted Dr. Flashman's opinions that Plaintiff should avoid external distractions and multi-tasking, write down complicated information, and take frequent short breaks between tasks. (*Id.*) Yet, without sufficiently explaining why, the ALJ did not include these limitations in his RFC determination.[6] (*See* AR 18.)

---

[6] Had the ALJ included these limitations in his RFC determination, pursuant to the VE's testimony at the administrative hearing, there would have been no jobs that Plaintiff could perform. (AR 130–32.)

The ALJ also inaccurately stated that Dr. Brock's opinions are "not consistent with Dr. Korgeski's consultative examination." (AR 24.) The ALJ refers to the Psychological Evaluation performed by Dr. Korgeski on October 27, 2015, wherein Dr. Korgeski found that Plaintiff "appeared to be mildly scattered and impulsive, slightly circumstantial," with a fund of information that was "a bit lower." (AR 816.) Dr. Korgeski diagnosed PTSD, depression, anxiety, and a number of other possible disorders, explaining: "[Plaintiff] appears to be rather withdrawn, not functioning in the community, primarily interested in staying by himself and perhaps pursuing some hobbies, although he also presents as someone who would like to work if he could find a way to do this." (AR 817.) Like Dr. Brock, Dr. Korgeski recommended "a more exten[sive] evaluation to parse [Plaintiff's] particular difficulties more clearly." (*Id.*) The ALJ discussed Dr. Korgeski's opinions in his decision, but did not state what weight he afforded to them, noting that Dr. Korgeski "declined to provide any formal opinion regarding [Plaintiff's] functional limitations." (AR 21.) Even without a "formal opinion," the Psychological Evaluation completed by Dr. Korgeski has value with respect to Plaintiff's application for disability benefits, as it provides insight into Plaintiff's mental limitations during the relevant period by a consulting psychologist who examined Plaintiff. This is particularly so, considering that the opinions contained in Dr. Korgeski's Evaluation are consistent with those of Plaintiff's treating physician, Dr. Brock, and the other treating or examining providers discussed above.

Instead of assigning significant weight to the opinions of Dr. Brock or any of Plaintiff's other treating or examining sources, the ALJ assigned "great weight" to the opinions of nonexamining agency consultants Drs. Shapiro and Reilly (AR 23), who opined in November 2015 and March 2016, respectively, that Plaintiff had moderate limitations in the "B" criteria of the listings, was moderately limited in maintaining attention and concentration, retained the ability to engage in one- to four-step tasks, and was moderately limited in interacting appropriately with the general public and coworkers but maintained the social capacity for routine interaction with coworkers and supervisors (AR 225–29, 251–55). Although the ALJ stated that he gave these opinions "great weight," his decision differed from them by finding that Plaintiff had only "mild limitation[s]" in understanding, remembering, or applying information, where Drs. Shapiro and Reilly opined that Plaintiff was moderately limited in this area.

The ALJ explains his decision to assign great weight to the opinions of Drs. Shapiro and Reilly by stating that these opinions are consistent with Dr. Flashman's opinion that Plaintiff should "avoid multi-tasking and complete one[] step at a time and avoid distractions." (AR 23.) But, as discussed above, the opinions made in Dr. Flashman's Neuropsychological Evaluation are not consistent with the opinions made in Dr. Shapiro's and Dr. Reilly's reports. For example, where Drs. Shapiro and Reilly opined that Plaintiff could sustain attention and concentration for one- to four-step tasks over two hour periods (AR 240, 267), Dr. Flashman found Plaintiff more limited, stating that he "may wish to complete

one task before moving on to the next, as he may have a harder time when he is trying to multi-task or manage multiple projects at one time" (AR 1161).

The ALJ further explains his decision to assign great weight to the opinions of Drs. Shapiro and Reilly by stating that these opinions are consistent with Plaintiff's activities of living, including cooking, doing chores around the house, handling his own finances, and doing woodworking projects. (AR 23.) This finding misrepresents the record, which reveals that Plaintiff does very few and limited daily activities. In a September 2015 Function Report, Plaintiff stated that he sat in a chair most of the day, going outside only to shop for groceries twice a week for 20 minutes each time or to attend appointments. (AR 508, 510.) Although he stated that he completed household chores, he specified that that entailed spending only 1.5 hours on laundry once per week and cleaning for only two hours per week total, hardly indicative of an ability to work a full-time job. (AR 509.) Plaintiff stated that, although he "used to be more active" in terms of having hobbies and interests, he had "completely stopped" these activities. (AR 511.) In October 2015, Plaintiff reported to Dr. Korgeski that he "spends his days doing nothing," other than: shoveling his driveway when necessary (and then he is in bed for a day or so after), watching movies, building fishing rods, cooking for himself, learning the computer "a bit," and driving to appointments (but not far due to pain). (AR 816.) At the June 2017 administrative hearing, Plaintiff testified that his daily activities consisted of pacing around his mobile home for most of the day, watching one or two hours of television, listening to music, going grocery shopping twice a week

(spending only "probably six minutes" in the store and going at times when the store will be "slow"), having a friend over to play cards and eat on occasion, taking his trash to the dump every one or two weeks, mowing the lawn when needed, and keeping his kitchen clean. (AR 186, 190, 197–202.) Contrary to the ALJ's finding (AR 23), Plaintiff's daily activities are quite limited, consistent with the opinions of Dr. Brock and Plaintiff's other treating and examining providers. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("a claimant need not be an invalid to be found disabled") (internal quotation marks omitted); *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as []he would be by an employer.").

Moreover, the opinions of Drs. Reilly and Shapiro are deserving of less weight because they were rendered before Dr. Brock's Medical Source Statement, Dr. Flashman's Neuropsychological Evaluation, and social worker Baslock's Assessment were completed; and before much of Plaintiff's mental health treatment occurred. Specifically, after the agency consultants issued their opinions in November 2015 and March 2016, respectively, Dr. Brock treated Plaintiff several

times (AR 928, 930, 1022–23, 1215); Carpenter evaluated Plaintiff on one occasion (AR 1056); and Nurse Burzynski treated Plaintiff on one occasion (AR 1091). Although the ALJ acknowledged the fact that "additional medical evidence was provided after [Drs. Reilly and Shapiro made their opinions]," he still afforded "great weight" to the agency consultant opinions, in contradiction to the Second Circuit's holding that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician. *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011); *see Burgess*, 537 F.3d at 130–31 (finding that testifying medical expert's opinion "was flawed by the fact that he did not examine the key piece of evidence in the record . . . ; [and] thus the ALJ's reliance on [that doctor's] opinion was itself a flaw").

In sum, Dr. Brock was Plaintiff's treating primary care physician, and his opinions are consistent with the record, including the opinions and treatment notes of several other treating and examining sources, namely Dr. Flashman, Dr. Korgeski, Nurse Burzynski, Carpenter, and social worker Baslock. The ALJ thus should have assigned more than "little weight" to Dr. Brock's opinions. At a minimum, Dr. Brock's opinions are worthy of more weight than the opinions of nonexamining agency consultants Drs. Reilly and Shapiro, who never met with Plaintiff and thus made their opinions based merely on their review of the record and prior to significant additional medical evidence was added to the record. *See Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (holding that where there are

conflicting opinions between treating and consulting sources, the "consulting physician's opinions or report should be given limited weight"); *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia*, 418 F. App'x at 18 (where it is unclear whether consultant reviewed all of claimant's relevant medical information, consultant's opinion is not supported by evidence of record as required to override treating physician opinion). Moreover, the ALJ should have assigned more weight to the opinions of Dr. Flashman, and should have considered the opinions of social worker Baslock and assigned a weight to the opinions of Dr. Korgeski. *See Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) ("The plaintiff . . . is entitled to know why the ALJ chose to disregard the portions of the medical opinions that were beneficial to her application for benefits.").

## III. Appeals Council's Failure to Consider New Evidence

Next, Plaintiff claims the Appeals Council erred in failing to consider certain new evidence submitted after the date of the ALJ's decision. (*See* AR 2.) Specifically, Plaintiff submitted a January 2019 treatment note from Dr. Christos Colovos, wherein Dr. Colovos assessed Plaintiff with bilateral hand numbness, thinning of skin, and enlarged and hypertrophic nails. (AR 47.) Dr. Colovos recorded that Plaintiff had thin skin over his right second MCP joint that frequently

tore with hand flexion.  (*Id.*)  Noting that Plaintiff's complaints of functional

limitation appeared to be "genuine" (*id.*), Dr. Colovos stated that Plaintiff had

limited capacity to perform work because of "bleeding knuckle" (AR 45).  The

Appeals Council acknowledged receipt of this evidence but found that it was "not

material because it is not relevant to [Plaintiff's] claim for disability."  (AR 2.)

In general, the Appeals Council must receive new evidence submitted to it

following the ALJ's decision if the evidence is "new, material, and relates to the

period on or before the date of the [ALJ] decision, and there is a reasonable

probability that the additional evidence would change the outcome of the decision."

20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5); *see Perez v. Chater*, 77 F.3d 41, 45

(2d Cir. 1996).  Evidence is material if it is "relevant to the claimant's condition

during the time period for which benefits were denied."  *Mauro v. Comm'r of Soc.*

*Sec. Admin.*, 746 F. App'x 83, 84 (2d Cir. 2019).  Here, the new evidence post-dates

the ALJ's decision and does not relate to the alleged disability period.  Specifically,

Dr. Colovos authored the January 2019 treatment note over three years after

Plaintiff's date last insured of June 30, 2015, and the note includes no retrospective

analysis regarding Plaintiff's condition during the alleged disability period.

Therefore, the evidence is a contemporaneous treatment note from after the alleged

disability period that does not relate to the relevant period, and thus does not affect

the ALJ's decision.  The Court finds no error in the Appeals Council's decision not to

consider the new evidence.

## IV.     Remaining Issues

Remand is required due to the ALJ's flawed analysis of the medical opinions of treating primary care physician Dr. Brock and the other treating and consulting medical sources mentioned above.  *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").  Once a new analysis of these opinions is conducted, the Commissioner will be required to redetermine Plaintiff's RFC and make a new step-five assessment regarding whether other jobs exist in significant numbers in the national economy that Plaintiff can perform.  Therefore, the Court need not reach Plaintiff's claims regarding these issues, *see Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand."), except to note that, after reanalyzing the treating physician opinions on remand, the ALJ shall craft a new RFC determination, present new hypotheticals to the VE, and reassess whether there are jobs existing in significant numbers in the national economy that Plaintiff can perform.

## V.     Remand for Further Proceedings or for a Calculation of Benefits

Finally, Plaintiff asks that the matter be remanded for a calculation of benefits, rather than for further proceedings.  In cases where there is "no apparent

basis to conclude that a more complete record might support the Commissioner's decision," reversal for a calculation of benefits may be appropriate. *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). Courts have reversed and ordered that benefits be paid when the record provides persuasive proof of disability and a remand for further proceedings "would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). Where, however, there are gaps in the administrative record or the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision. *Rosa*, 168 F.3d at 82–83; *see also Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996). Here, it cannot be said that a remand for further proceedings would serve no purpose. Once the ALJ properly analyzes the medical opinions, a new RFC determination will require further testimony from a VE about what, if any, jobs Plaintiff can do and whether they exist in significant numbers in the national economy. Therefore, the claim must be remanded for further proceedings rather than for a calculation of benefits.

## Conclusion

For these reasons, the Court GRANTS Plaintiff's motion (Doc. 11), in part; DENIES the Commissioner's motion (Doc. 12); and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 9th day of January 2020.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge